Filed 2/19/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of MARY KAY BREWSTER and CHRIS CLEVENGER. | H045050 (Monterey County Super. Ct. No. DR54512) |
| MARY KAY BREWSTER, Appellant, v. CHRIS CLEVENGER, Respondent. | |

In this marital dissolution proceeding, the trial court entered judgment denying appellant Mary Kay Brewster's (Mary Kay) request for spousal support orders because she suffered criminal convictions for acts of domestic violence against respondent Chris Clevenger (Chris). In doing so, the trial court determined Mary Kay had not overcome the rebuttable presumption set forth in Family Code section 4325[1] against an award of support to a spouse convicted of domestic violence. On appeal, Mary Kay contends there is not substantial evidence to support the trial court's factual determinations, such that the court abused its discretion in denying her spousal support. We disagree and affirm the ruling.

Mary Kay also appeals the trial court's characterization of post-separation payments Chris made to her. The trial court found that Chris deposited $10,000 into a

---

[1] All undesignated statutory references are to the Family Code unless otherwise noted.

joint account for Mary Kay's use in lieu of temporary spousal support, pursuant to the agreement of the parties. She contends the trial court did not have jurisdiction over temporary spousal support at the time of the trial, and did not have jurisdiction to make retroactive orders. She does not believe substantial evidence supports the trial court's finding that the parties had an agreement regarding the payments, and asserts the trial court erred when it found the deposits taxable to her and deductible by Chris. For reasons we explain below, we reject Mary Kay's contentions and affirm the ruling.

Finally, Mary Kay contends the trial court erred in awarding the parties' Gables Land and Cattle Company/ Duck Club membership (Duck Club membership) to Chris at a value of $60,000, as the parties stipulated on the record to the value being $65,000. We agree. We will modify the judgment to reflect the parties' actual stipulation, and affirm the judgment as modified.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties were married almost 21 years prior to separating in August 2013. Mary Kay filed for dissolution shortly after they separated.

Both parties are physicians; they met in medical school. Mary Kay had an obstetrics/gynecology practice and provided medical weight loss services; Chris had a general orthopedic surgery practice.

### A. *Pre-trial Proceedings and Request for Orders Related to Spousal Support*

In March 2015, Chris filed a request for orders asking the court to set temporary spousal support pursuant to "guideline," commensurate with each parties' income.[2] Chris

_____

[2] Pursuant to the Superior Court of California, County of Monterey, Local Rules, rule 10.03(A), "Temporary spousal support will ordinarily be determined in accordance with Santa Clara County's Temporary Spousal Support Guidelines; the court may order non-guideline temporary spousal support upon a showing of good cause." In Santa Clara County, the trial court generally uses a specified formula to determine temporary spousal support based on each party's income, often referred to as a guideline formula. (Super. Ct. Santa Clara County, Local Family Rules, rule 3(C) and Appen. A(3).)

2

stated in his request that he had been "sharing" his income with Mary Kay since separation, by depositing the income into a joint account used by Mary Kay to "cover her expenses." Chris also indicated he was paying the mortgage and property taxes on the family home where Mary Kay resided, without financial assistance from her. Although Chris asked the court to set "guideline" support, he also informed the court that Mary Kay had been charged with "several criminal counts" involving harassment against him. Based on Mary Kay's alleged actions, Chris believed he should not be required to support her. According to the trial court's register of actions, Mary Kay did not file a written response to Chris's request.

The trial court set the dissolution case for trial beginning in October 2016.[3] In advance of the trial, Chris asked the court to take judicial notice of "Monterey County Superior Court Case No. CRSS142474A, People of the State of California vs. Mary Kay Brewster [Mary Kay's criminal action]," pursuant to Evidence Code section 452, subdivision (d),[4] alleging the "above file is relevant regarding the issues concerning any award of spousal support in the [dissolution matter]." He acknowledged that his request for orders related to temporary spousal support was still pending, the court having reserved jurisdiction to order support retroactive to March 4, 2015. However, Chris also invoked sections 4320, subdivisions (i) and (n), and 4325 to argue that he should not have to pay either temporary or permanent spousal support to Mary Kay, as she was convicted

---

[3] Chris contends the trial court set his request for temporary spousal support for hearing at the same time as the trial in the matter. On appeal, Mary Kay denies the trial court reserved jurisdiction over the request. We address this issue in detail in section II(C)(1) and (2), *post*.

[4] The trial court has discretion to take judicial notice of records of any court of this state. (Evid. Code, § 452, subd. (d).) The court is required to take judicial notice of matters specified in Evidence Code section 452 upon the request of a party, if the party "(a) Gives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and (b) Furnishes the court with sufficient information to enable it to take judicial notice of the matter." (Evid. Code, § 453.)

of an act of domestic violence in January 2016.[5]  To the extent the court decided to award spousal support to Mary Kay, Chris argued Mary Kay was "underemployed," and had the ability and opportunity to earn more income.  Chris also alleged the parties agreed the Duck Club membership would be assigned to Chris at a value of $60,000.  Mary Kay did not file a brief prior to the trial.

### B.  Trial Proceedings

The court held four days of trial in October and December 2016, and January 2017.  The parties submitted written closing arguments.

#### 1.  Stipulations and Rulings Prior to Testimony

On the first day of trial, the court addressed Chris's request for judicial notice of Mary Kay's criminal action.  The court indicated it was able to obtain "a sentencing report from January and the restitution hearing minutes of May 13th"; the corresponding minute order specifies each of these documents were from 2016.  After intimating that it

---

[5] At the time of trial in 2016 and 2017, section 4320, former subdivision (i) required the court, in setting permanent spousal support, to consider, "Documented evidence, including a plea of nolo contendere, of any history of domestic violence, as defined in Section 6211, between the parties . . . , including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party." (Stats. 2015, ch. 137, § 1.)  Former section 4325 provided, "(a) In any proceeding for dissolution of marriage where there is a criminal conviction for an act of domestic violence perpetrated by one spouse against the other spouse entered by the court within five years prior to the filing of the dissolution proceeding, or at any time thereafter, there shall be a rebuttable presumption affecting the burden of proof that any award of temporary or permanent spousal support to the abusive spouse otherwise awardable pursuant to the standards of this part should not be made.  [¶] (b) The court may consider documented evidence of a convicted spouse's history as a victim of domestic violence, as defined in Section 6211, perpetrated by the other spouse, or any other factors the court deems just and equitable, as conditions for rebutting this presumption.  [¶] (c) The rebuttable presumption created in this section may be rebutted by a preponderance of the evidence." (Stats. 2001, ch. 293, § 3.)

Section 4320, subdivision (n), which has not been modified since the time of trial, allows the trial court to consider "[a]ny other factors the court determines are just and equitable" in setting permanent spousal support.

4

was having difficulty obtaining the criminal records from another courthouse, the court stated, "If there are additional documents that you would like me to review, it might be helpful, if you had copies, to have a copy made for the Court. Or if there's something specific that you have in mind." The minute order from the first day states, "Court informs the parties that she has only taken judicial notice of the minute orders from May 13, 2016 regarding restitution and January 13, 2016 sentencing hearing from [Mary Kay's criminal action]. Parties inform the court they will have additional information regarding the criminal matter during the trial."

Amongst several stipulations recited by the parties on the first day of trial, the parties agreed the Duck Club membership would be assigned to Chris at a value of $65,000; Chris's attorney recited the agreement; Mary Kay and her attorney both confirmed the value.

### 2. *Mary Kay's Criminal Convictions*

During her testimony, Mary Kay admitted to having been "convicted of some criminal counts" the prior year. She did not provide specific information about the acts that led to the conviction; nor did Chris testify about the conduct that resulted in Mary Kay's conviction.[6]

The court admitted into evidence the January 13, 2016 minute order from the criminal court records, entitled "Sentencing and Report," reflecting Mary Kay's conviction on four counts: Penal Code section 646.9, subdivision (a) [stalking] (counts 1

---

[6] In her written closing argument, Mary Kay provided the following description of her conduct, which occurred in June 2014: "The circumstances are that [Mary Kay] put a small 'pet' snake (non-poisonous ball python purchased at a Salinas pet shop) and 3 small rats into the home where [Chris] was residing while [Chris] was vacationing in the Sierra mountains. The snake and rats were discovered by a 3rd person before [Chris] returned from his vacation. There was no physical touching of any sort or type, [Chris] was not hurt or damaged in any way, he was not put in a position of fear for his personal safety and he suffered no physical pain or injury as a result of [Mary Kay's] actions."

and 3)[7]; Penal Code section 594, subdivision (b)(1) [vandalism] (count 4); and, Penal Code section 602.5, subdivision (a) [unauthorized entry in noncommercial residential place] (count 5). Mary Kay testified that counts 1 and 5 [stalking and unauthorized entry in a noncommercial residential place] "related to" Chris.[8] The minute order indicated the criminal court placed Mary Kay on probation for three years. As conditions of probation, she was ordered to serve 150 days in the county jail, to pay a domestic violence fee, and to complete one year of domestic violence counseling. The criminal court issued a criminal protective order (Pen. Code, § 136.2), including Chris as a protected party, and designated the matter a "[d]omestic violence case," citing Penal Code section 13700.[9]

---

[7] Although the sentencing report and the later minute order from the January 27, 2016 hearing list count 1 (Pen. Code, § 646.9, subd. (a)) as a felony, the court reduced the charge to a misdemeanor pursuant to Penal Code section 17, subdivision (b), at the sentencing hearing.

[8] Pursuant to Penal Code section 646.9, subdivision (a), "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, . . . ." ". . . '[H]arasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (Pen. Code, §646.9, subd. (e).) ". . . '[C]ourse of conduct' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." (Pen. Code, § 646.9, subd. (f).) ". . . '[C]redible threat' means a verbal or written threat, . . . or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family." (Pen. Code, § 646.9, subd. (g).)

[9] Penal Code section 13700 is located in Part 4, Title 5 of the Penal Code, governing "Law Enforcement Response to Domestic Violence." The statute sets forth various definitions, including defining "Domestic violence" as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (Pen. Code, § 13700, subd. (b).) " 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing

The court also admitted into evidence the January 27, 2016 minute order from a "setting of restitution hearing," at which the court modified one of the terms of Mary Kay's probation.

During the trial, the parties did not submit into evidence any other documents relating to Mary Kay's criminal action. While cross-examining Chris on the third day of trial, Mary Kay's attorney referenced Chris's criminal trial testimony. Chris's counsel suggested Chris should be provided the transcripts of that testimony, but Mary Kay's attorney did not have certified copies available to lodge with the court. The court requested that Mary Kay's counsel move on to a different line of questioning, and revisit Chris's criminal trial testimony once he had the certified transcripts available. Mary Kay's attorney suggested he would bring the certified transcripts on the next trial day; he asked the court to reserve jurisdiction for additional cross-examination of Chris once he did so. On the fourth and final day of trial, Mary Kay's attorney did not revisit Chris's testimony during the criminal action.

### 3. *Testimony Regarding Alleged Incidents of Domestic Violence Against Mary Kay*

During trial, Mary Kay testified to three incidents that form the basis of her contention that she was the victim of domestic violence perpetrated by Chris, and thus that she rebutted the section 4325 presumption against ordering spousal support to a perpetrator of domestic violence.

#### a. *September 2009 Incident*

In September 2009, Mary Kay alleged she grabbed Chris by the shirt during a discussion about the couple's lack of intimacy. In response, Chris "grasped [her] right hand and looked [her] in the eye, as he very coldly took [her] fingers and bent them backwards until he felt one of them dislocate. It popped and you could feel it as well."

---

another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).)

7

Mary Kay claimed Chris bent her fingers for 20 seconds, doing it "very slowly and intentionally." Mary Kay testified that she did not let go of Chris's shirt once he grabbed her, saying, "He had to dislocate my finger to get me to let go of his shirt." Mary Kay obtained an x-ray of her finger, which was not broken, but had soft tissue swelling; the finger relocated. She felt pain as a result of the injury for three to four days.

Chris confirmed during his testimony that he removed Mary Kay's hand from his shirt after she grabbed it, however he says he did so because Mary Kay grabbed his shirt and would not let go. Chris asked Mary Kay to stop, but she continued to hold his shirt, requiring him to pull Mary Kay's hand away. Chris did not perceive any dislocation of Mary Kay's fingers, although he is aware she had an x-ray, which did not reveal dislocation or fracture. He does not recall if Mary Kay complained of any pain, or seeing any discoloration in her hand.

### b. May 2012 Incident

Mary Kay testified she went to Chris's office to get a checkbook in May 2012; while there, Mary Kay confronted him about an affair. She claimed she was sitting at Chris's desk when she found a receipt for a piece of jewelry; when Mary Kay asked Chris about the receipt, "he became infuriated. Came around from the front of the desk and grasped [Mary Kay] by the upper arms and pulled [her] up out of the chair and escorted [her] out of the office into the hallway. At which point he was screaming 'Get out of here. Get out.' " Mary Kay contended Chris "threw [her] out into the hall," causing her to go "into the wall across the hallway." As a result of the incident, Mary Kay claimed she had bruises on her upper arms that persisted for months which were very painful; people stopped her on the street to ask her what happened.

Chris alleged Mary Kay came to his office during business hours with staff and patients present to confront him about the affair, with no discussion of the checkbook. Mary Kay became angrier as the conversation went on. Because he had patients to see, Chris indicated to Mary Kay that it was not the time or place to discuss the matter. Chris

8

asked Mary Kay to leave, but she refused. Chris had to "take her and escort her out to get her to leave . . . ." By "escort," Chris meant "move her in a direction toward the door," as she was not moving on her own and was not willing to leave when asked to do so. Chris took Mary Kay by the shoulders/ biceps of her arms and walked her out of his office. Mary Kay was resisting leaving his office; Chris moved her toward the door and opened it for her, but Mary Kay still would not leave, requiring Chris to walk with her to get her to exit the office. Chris denied pushing Mary Kay into anything. He did not pick Mary Kay up off the ground; he held her by the arms below the shoulder to help her towards the door. Chris did not recall if he saw bruises on Mary Kay's arms in the days following the incident.

### c. *March 2013 Incident*

In March 2013, Mary Kay once again went to Chris's office to get a checkbook. Although it was a Saturday and Chris's office was closed, Chris was there. Mary Kay testified Chris was "apparently alarmed that [she] was there." Mary Kay claimed the office was unlocked when she got there, although she did have a key which she obtained off of Chris's keychain without his consent or knowledge. Mary Kay went into Chris's office, where he was sitting behind his desk. Mary Kay saw a calendar on the wall; she took the calendar off the wall, removed a picture out of the calendar, and tore the picture in half, which caused Chris to become "enraged." Mary Kay then tore the whole calendar in half. "…[Chris] lurched out of his chair and stood up. He's very strong and tall." Mary Kay knocked a tray off of Chris's desk, containing patient charts, after which Chris came around the desk and "picked her up by her upper arms and carried [her] physically out of the office." Mary Kay alleged Chris "threw her down as hard as he could on the thinly carpeted cement floor," causing the clog shoes she was wearing to fly "about 18 feet up the hallway . . . ."

Mary Kay claimed she experienced "significant pain" in her right hip, although she was able to get up and run to the patient waiting room to try to call 911, where Chris

9

"tore the phone out of [her] hand."  Mary Kay attempted to use another phone, but Chris again "tore" that phone out of her hand.  Mary Kay then went into Chris's office to use his desk phone; when Chris "saw [her] in front of his computer, [he] fell on his knees, [and] started crying.  And then [Chris] crawled over with his hands, collapsed as if in prayer, and said, 'Please help me.  You've helped me so much.'  And he put his head in [Mary Kay's] lap." Mary Kay stated the parties then went home, and Mary Kay "consoled" Chris.

Mary Kay contended she sustained a "very significant injury" from the fall.  While on call at the hospital the next day, Mary Kay had an MRI.  The trial court allowed Mary Kay to offer her opinion as to what the MRI showed, based on her medical training and experience.  Mary Kay claimed blood "exsanguinated . . . into the joint and into the muscles . . . .  And it is not a superficial bruise or contusion . . . but a bleeding and hemorrhage into the joint."  Mary Kay experienced extreme pain for several months.  She also claimed she hit her head on the floor hard enough to "tear a hole in [her] retina," but not hard enough to cause a contusion to her head.  Mary Kay briefly discussed her injury with an orthopedist a few weeks after the incident, during a visit for an unrelated medical issue.  She did not go to the doctor to discuss her hip, but the doctor had seen the MRI and raised the issue.  Mary Kay testified that the office visit note from the appointment indicates the MRI showed edema or swelling, and that Mary Kay advised the orthopedist that she had moderate pain and discomfort in her hip at the time of the visit.[10]

Chris alleged he went to the office on the day of the incident and parked his car underneath the surgery center hoping Mary Kay would not see it there, as he did not want her to come in and "instigate . . . anything."  Chris had never given Mary Kay a key to his office, and believes he locked the door after entering that day.  Chris was surprised when

---

[10] During cross-examination, Chris's attorney showed Mary Kay the office visit note from this visit to refresh her recollection.  Neither party offered the note into evidence.

Mary Kay came in; he thought she was surprised to find him there as well. Mary Kay admitted that she had a key to the office, which she took off his keyring at some point and copied; she would not give it back to Chris, but agreed on a later date to throw it in the sewer while he watched. Chris testified Mary Kay came into his office, took a calendar off the wall, and tore it into pieces. He recalled Mary Kay saying things about his affair, and believes she came to the office to look around for details about the affair because she was "obsessed with finding out more details . . . ." Mary Kay then "pushed and threw" a stack of patient charts that were on his desk into the wall, causing Chris to ask her to stop destroying things. When Mary Kay refused, Chris "took her by the wrists and backed her out the door into the hallway. And she's still struggling, wanting to do whatever she wants to do in there. [¶] And [he] didn't just want to let go of her hands right away because she could hit [him]. So [Chris] gave her a push away from [him]. As [he] let go into the hall, she stepped back. She's wearing clogs. And as she stepped back, she went backwards, the clogs came off and she fell." Chris did not see Mary Kay hit her head against anything. Chris grabbed Mary Kay's wrists because he was frightened that she was starting to destroy items and throw things in his office and was afraid of what else she might destroy. Mary Kay was struggling with Chris as he backed her out of the office into the hallway.

After Mary Kay fell, Mary Kay indicated that she was going to call the police; Chris asked her not to. Chris put his hand on her phone; he did not recall seeing Mary Kay go into another room to use a different phone. He recalled that the parties discussed whether Mary Kay should call 911, and that Mary Kay decided not to place the call. Mary Kay eventually left his office. Mary Kay told Chris later that she had some hip discomfort; she also told him she had an MRI.

11

### 4. *Additional Evidence Pertaining to Mary Kay's Attempt to Rebut the Section 4325 Presumption*

Mary Kay argued that her medical condition constituted a "just and equitable" factor for the trial court to consider in evaluating whether she had rebutted the presumption against spousal support under section 4325, in addition to her allegations that Chris committed domestic violence against her.[11]

In November 2013, Mary Kay experienced cardiac arrhythmias. In late June 2014, Mary Kay was admitted into the hospital with severe left lower quadrant pain; medical staff conducted an echocardiogram that revealed "full-blown heart failure . . . ." Mary Kay was in the hospital for seven days as a result. Since that time, Mary Kay reported reduced endurance and increased weakness. She stopped her obstetrics practice after August 2014 as a result of fatigue.

Mary Kay also testified about her history of physical problems with her shoulders, hands, and feet. Mary Kay was wearing a sling at trial because she had shoulder surgery in September 2016, resulting from "some chronic prior injuries that remanifested recently . . . ." She had previously injured her shoulders doing rock climbing, long-distance triathlons, and skiing. Although she expressed concerned that her recent surgery may have "denervated" at least one head of the bicep of her arm, she testified that she felt she was recovering more quickly than expected, and was experiencing "very little pain."

Mary Kay also testified to "long-standing issues with [her] hands due to carpal tunnel syndrome." When the problem first started, she had carpal tunnel reduction surgery, causing the wasting of some of her thumb muscles. She had a second surgery many years later, which similarly resulted in the loss of "the intrinsic and thumb

---

[11] The parties also provided evidence relevant to the factors set forth in section 4320 for the trial court to consider in awarding permanent spousal support. As we will uphold the trial court's determination that Mary Kay did not overcome the section 4325 presumption against such an award, we will not discuss that evidence except as relevant to the other issues addressed in this opinion.

12

muscles." Because she had minimal grip strength in her thumb and hands as a result of the loss of these muscles, Mary Kay stopped doing obstetrics work. She did not renew her hospital privileges, primarily to avoid taking emergency room calls. She was still able to do laparoscopic and other "more precise types of surgeries . . . ." Mary Kay also started a medical weight loss practice, so she could shift her practice and continue to work without being "so dependent on [her] hands . . . ."

Subsequent to the second carpal tunnel surgery, Mary Kay was diagnosed with "significant osteoarthritis" and rheumatoid arthritis, causing pain at the base of her thumbs, joint deformities in her hands, loss of cartilage in both knees, and pain in her neck, right shoulder, knees, hands, and feet. She described her hands and feet as "chronic sources of pain."

### 5. *Closing Arguments and Court's Decision*

#### a. *Closing Arguments*

Each party submitted closing argument in writing. Mary Kay argued that the three incidents in September 2009, May 2012, and March 2013, constituted domestic violence against her perpetrated by Chris. She further contended that her conduct against Chris, which resulted in the conviction for an act of domestic violence, did not compare to the conduct addressed by appellate courts in cases discussing the rebuttable presumption of section 4325; nor did it compare to the factual situation the Legislature wanted to address in enacting section 4325, based on her review of the legislative history of the statute. Rather, Mary Kay argued that, in response to Chris's infidelity, she "commit[ed] a window of non-violent, but harassing acts that were more akin to a bad fraternity prank than anything else, and were completely out of character of anything [Mary Kay] has ever done in her entire lifetime, either before or since." Mary Kay noted that she was ill at the end of 2013 and beginning of 2014, suffering heart failure not long after committing the acts for which she was convicted; she has "since recovered physically from the heart failure and she has engaged in no acts or behaviors since which in any

13

stretch of the imagination could be construed as 'domestic violence' towards [Chris]." Mary Kay asked the trial court to find that Chris was seeking protection under section 4325 not out of fear for his safety, or to remove himself from an abusive situation, which is the goal of the statute, but rather to avoid his spousal support obligation in the parties' long-term marriage.

Chris asked the trial court to find Mary Kay had not produced sufficient evidence to overcome the presumption of section 4325, and that the testimony at trial about the three incidents established Mary Kay's additional domestic violence against Chris, as the evidence showed Mary Kay was the "aggressor" in each of the incidents.

With respect to the $10,000 payments Chris made from March 2015 through September 2016, Mary Kay argued, "[i]t was always [Mary Kay's] understanding that the funds . . . were 'in lieu of' a formal child and spousal support order. . . . [T]his was the agreement of the parties and should be honored and enforced." Chris, in his closing argument, did not reference an explicit agreement between the parties. He contended he deposited the funds to "protect his financial circumstances," and asked the court to treat the payments as spousal support, taxable to Mary Kay and deductible by Chris.

Chris confirmed the parties stipulated that he would be awarded the Duck Club membership; he did not specify the value assigned to that asset. Mary Kay did not mention the Duck Club membership in her closing argument.

### b. *Trial Court's Decision*

The trial court issued a tentative decision on April 17, 2017; on June 12, 2017, it issued a written judgment of dissolution incorporating the tentative decision. Neither party filed a request for a statement of decision pursuant to California Rules of Court, rule 3.1590(d) or otherwise objected to the tentative decision prior to the court adopting it as its judgment.

The trial court awarded the Duck Club membership to Chris at a value of $60,000. It found that the parties agreed Chris would deposit $10,000 per month into the parties'

14

joint bank account, which the parties both treated as being in lieu of support, undifferentiated between child and spousal support. Chris filed a request for temporary spousal support in March 2015 to ensure he received credit for the monthly deposits, which he intended to be used to pay the mortgage, insurance, and property taxes on the family residence, as well as household expenses. The trial court found that the deposits Chris made between March 2015 and September 2016 would be "deemed payments in lieu of spousal support," taxable to Mary Kay and deductible by Chris, as they were "intended and understood by the parties to be in lieu of support."

The trial court rejected Mary Kay's request that it find stalking was not the type of behavior the Legislature intended to give rise to the rebuttable presumption under section 4325; the court determined section 6203 did not limit the definition of abuse to actual physical injury or assault. As stalking was listed as conduct that could be enjoined under section 6320, the trial court ruled section 4325 did apply.

To determine whether Mary Kay overcame the section 4325 presumption, the court considered the three incidents of alleged domestic violence committed by Chris against Mary Kay, doing so "in consideration of justice and equity." Regarding the September 2009 incident, the court found the evidence did not support a determination that Chris was the aggressor in the event, or that the injury was the result of abuse as defined in section 6203, "as the evidence does not preponderate toward a finding that [Chris] intentionally or recklessly injured [Mary Kay's] hand or finger or that he engaged in the prohibited behavior described in [] section 6320."

With respect to the May 2012 event, the trial court found, "[a]fter weighing and considering the evidence presented, it appears that [Mary Kay] began the verbal altercation at [Chris's] place of business and refused to end it, despite the presence of patients and staff. [Chris] tried to end the aggression. The Court finds [Chris] more credible in his testimony as to the event, and does not find that the event constitutes

15

documented evidence of domestic violence for purposes of rebutting Family Code section 4325."

Finally, concerning the March 2013 incident, the court found that Mary Kay entered Chris's locked medical offices using a key she took off Chris's key chain, which she never told him she had taken. Mary Kay then "angrily confront[ed] [Chris] about his affair," destroying a wall calendar and pushing patient charts and records on to the floor. The court found Chris "testified credibly about his efforts to end the confrontation." The court noted Mary Kay made no effort to leave the building after she fell or was pushed down by Chris; she did not explain why she did not call 911 or otherwise remove herself to safety. "Instead, she testified that she decided to again enter [Chris's] private office, sit in front of his computer and begin reading his email. She testified that after reading his email she went home and later consoled [Chris]. The Court does not find that this evidence preponderates toward a determination that [Chris] committed domestic violence against [Mary Kay] as defined in the Code or that the event of March 2013 rebuts the presumption against an award of spousal support."

In addition to these three events, the trial court considered Mary Kay's contentions that she "is not violent, is not likely to recidivate, and has not violated the terms of the protective order," as well as Mary Kay's assertions that Chris raised the section 4325 presumption not to protect himself from further abuse at her hands, but rather to avoid his spousal support obligation following the parties' long-term marriage. The court acknowledged section 4325 allowed it to consider "the totality of the circumstances, and facts [Mary Kay] has raised in mitigation. On balance, the Court does not find that the three events to which the parties testified preponderate toward a finding that the statutory presumption against an award of spousal support to [Mary Kay], who has been convicted of conduct defined in the Family Code as domestic violence, has been rebutted." The court determined it "should not" and would not order temporary spousal support, beyond

16

the $10,000 payments from March 2015 to September 2016, which it deemed as payments in lieu of temporary support.

Despite its finding that Mary Kay had not rebutted the section 4325 presumption, the court addressed permanent spousal support, discussing the relevant section 4320 factors.[12]  The court found, "[Mary Kay] testified to certain injuries which have required surgeries and physical rehabilitation, but she continues to have the ability to work and provide for her own support. . . . [Mary Kay] continues to have difficulties relating to her hands and wrists, following her surgeries for carpal tunnel syndrome.  Following the acts for which she was convicted (placing a ball python snake and rats in [Chris's] bedroom) [Mary Kay] sustained heart failure, but has since recovered."  Ultimately, "[t]he Court gave weight to each of the Family Code section 4320 factors, but weighted more heavily the fact of documented domestic violence perpetrated by [Mary Kay] against [Chris], as set forth more fully above.  [¶]  It is the judgment of the Court that spousal support be set at zero, with the Court retaining jurisdiction over spousal support in this marriage of long duration."

Mary Kay timely filed a notice of appeal of the judgment.  (Code Civ. Proc., § 904.1, subd. (a)(1); Cal. Rules of Court, rule 8.104(a).)

## II. DISCUSSION

### A. *Mary Kay's Request for Judicial Notice*

Mary Kay asks this court to take judicial notice of excerpts from two volumes of the transcript of proceedings in the criminal matter against her, *The People of the State of*

---

[12] Section 4320 sets forth 14 factors the trial court "shall consider" in awarding permanent spousal support.  In addition to the section 4320 factors discussed in footnote 5, *ante*, the required factors include the parties' earning capacities and needs relative to the marital standard of living (§ 4320, subd. (a) & (d)), the parties' ages and health (§ 4320, subd. (h)), the balance of hardships to each party (§ 4320, subd. (k)), and the goal that the supported party become self-supporting within a reasonable period of time (§ 4320, subd. (l)).

*California v. Mary Kay Brewster*, Case No. SS142474A, as well as the Monterey Police Department Report in Case No. YG 1402592, dated May 22, 2014 (the police report). The trial court did not consider any of these documents as evidence in issuing the judgment that forms the subject of this appeal. We will deny Mary Kay's request for judicial notice.[13]

At trial, Mary Kay's attorney attempted to introduce the reporter's transcripts from the criminal trial; Chris's attorney objected on the grounds Mary Kay did not lodge certified transcripts with the court. While the trial court indicated it would require Mary Kay's counsel to provide certified transcripts, it also indicated counsel could revisit the testimony requiring those transcripts once certified copies were available. Mary Kay did not challenge that ruling at trial, nor does she challenge it on appeal. Moreover, Mary Kay's counsel did not offer certified transcripts or ask to revisit the testimony later in the trial.

The trial court was not required to take judicial notice of the record from Mary Kay's criminal action; those records were subject to discretionary judicial notice under Evidence Code section 452, subdivision (d)(1). While Evidence Code section 453 requires the trial court to take judicial notice of otherwise discretionary matters if sufficient notice is provided to the opposing party and if the requesting party provides the trial court with sufficient information to enable it to take judicial notice (see fn. 4, *ante*), Chris did not "furnish[] the court with sufficient information to enable it to take judicial notice of" the entire criminal court file, in that he did not provide copies of the documents he wanted the court to judicially notice. (Evid. Code, § 453, subd. (b); *People v. Maxwell* (1978) 78 Cal.App.3d 124, 130-131.) Neither party asked the trial court to take judicial notice of the police report; that document is not subject to either mandatory or

---

[13] Mary Kay submitted a reply to Chris's opposition to her motion for judicial notice in October 2018. Although she should have sought permission to file the reply before doing so, we will allow it, as there is no resulting prejudice to Chris.

discretionary judicial notice under Evidence Code sections 451 or 452; it is not part of a court record under section 452, subdivision (d), nor is it a record of the "official acts of the legislative, executive, [or] judicial departments" of the state under section 452, subdivision (c).

The appellate court does not take judicial notice of matters not considered by the trial court, absent exceptional circumstances. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2, as mod. (Sept. 1, 2010) (*Haworth*); *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) When reviewing the correctness of a trial court's judgment, we only consider matters that were part of the record at the time the court entered the judgment; " '[t]his rule preserves an orderly system of litigation by preventing litigants from circumventing the normal sequence of litigation.' [Citation.]" (*Haworth*, at p. 379, fn. 2.) "An appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459[14] of a matter which should have been presented to the trial court for its consideration in the first instance. [Citations.]" (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325-326, as mod. (Jan. 18, 1996); accord *People v. Peevy* (1998) 17 Cal.4th 1184, 1207-1208.)

This appeal does not present exceptional circumstances that would require us to deviate from the standard rule. Mary Kay has not provided any explanation as to why she did not present additional documents from the criminal case or the police report during the trial; the trial court clearly indicated it would consider additional documents presented by the parties. Moreover, Mary Kay does not explain why she did not provide certified transcripts of the testimony from the criminal matter, despite the trial court's

---

[14] "The reviewing court shall take judicial notice of (1) each matter properly noticed by the trial court and (2) each matter that the trial court was required to notice under Section 451 or 453. The reviewing court may take judicial notice of any matter specified in Section 452. The reviewing court may take judicial notice of a matter in a tenor different from that noticed by the trial court." (Evid. Code, § 459, subd. (a).)

19

indication it would allow her attorney to return to the relevant line of questioning once he lodged those transcripts with the court.

Mary Kay contends there is "no way to determine from the record in this case what the trial court reviewed in terms of the entire criminal record." We disagree. The record on appeal includes all exhibits introduced during the trial, the court reporter's transcripts from the trial, and the trial court's tentative decision and judgment, both of which provide information about the basis for the court's rulings in this matter. Moreover, at the start of the trial, the court indicated it did not have access to the criminal file other than the two documents it specifically identified. The portion of the record reflecting Mary Kay's attempt to present the uncertified copies of the reporter's transcripts from the criminal trial during Chris's testimony suggests the trial court did not review those copies in making its decision.

While Mary Kay correctly notes Chris first asked the trial court to take judicial notice of the criminal court records, that fact does not require us to now consider those documents that the trial court did not review in making its decision. Mary Kay cites *People v. Hopson*, where the California Supreme Court considered whether a criminal defendant "opened the door" to the use of an "unconfronted" out-of-court confession by a deceased person that the trial court otherwise erroneously admitted into evidence in violation of the defendant's Sixth Amendment right to confront her accusers. (*People v. Hopson* (2017) 3 Cal.5th 424, 425, 438-443.) The case is inapposite, as it addresses the admissibility of evidence in a criminal prosecution under constitutional standards. However, to the extent that Mary Kay contends that Chris's pretrial request for judicial notice of Mary Kay's criminal records justifies this court's consideration of new evidence not presented at trial, we note her attorney had the opportunity to present the transcripts and other court records and reports to the trial court, but did not take the appropriate steps to do so. Mary Kay was not denied the opportunity to present this evidence at trial. We therefore decline to exercise our discretion to take judicial notice of the excerpts from

20

two volumes of the transcript of proceedings in Mary Kay's criminal matter, or the May 22, 2014 Monterey Police Department Report.

## B. The Trial Court Did Not Abuse Its Discretion Regarding the Section 4325 Presumption

The parties do not dispute that Mary Kay was convicted of an act of domestic violence within five years prior to the filing of the dissolution proceeding, thus implicating the rebuttable presumption of section 4325, subdivision (a). Mary Kay's conviction for stalking Chris falls within the definition of domestic violence under sections 6203, subdivision (a)(4), 6211, subdivision (a), and 6320, subdivision (a). These statutes are found within the Domestic Violence Prevention Act (DVPA) (§ 6200, et seq.), the purpose of which is to "prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the person involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence. (§ 6220.) In Appellant's Opening Brief, Mary Kay concedes, " 'Stalking' is an act of 'domestic violence.' (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1140.)" The question on appeal is whether the trial court erred in finding Mary Kay did not rebut the section 4325 presumption. We conclude the trial court carefully weighed the evidence and acted within its discretion.

### 1. Standard of Review

We review the trial court's decision to deny spousal support based on the presumption of section 4325 for abuse of discretion. (See *In re Marriage of Kelkar* (2014) 229 Cal.App.4th 833, 845 (*Kelkar*); *In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059, 1066 (*Freitas*).)[15] A trial court abuses its discretion when it exceeds the "bounds of reason" in exercising it, having considered all the circumstances before it.

---

[15] In Appellant's Opening Brief, Mary Kay argues we review the trial court's ruling under the substantial evidence test. In her Reply Brief, Mary Kay seemingly concedes the abuse of discretion standard is the appropriate one to apply to the trial court's determination.

(*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 (*Denham*).) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).) Mary Kay bears the burden of establishing the abuse of discretion; we will not substitute our opinion and divest the trial court of its discretionary power unless she shows a clear case of abuse and a miscarriage of justice. (*Denham*, at p. 566.) We evaluate abuse of discretion relative to the legal principles governing the subject of the action. (*Sargon*, at p. 773.)

We defer to the trial court's determination of the facts if supported by substantial evidence. "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479; accord *Walker v. Superior Court* (1991) 53 Cal.3d 257, 272.) As the trier of fact, the trial court is the sole judge of the credibility and weight of the evidence; we do not judge credibility on appeal. (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 319 (*Oliverez*).) As the judge of credibility, the trial court may reject evidence, even uncontradicted evidence, as unworthy of credence. (*Ibid*.)

## 2. The Trial Court Did Not Abuse Its Discretion When It Denied Spousal Support

### a. Section 4325

The Family Code requires the trial court to consider domestic violence between the parties when evaluating requests for either temporary spousal support under section 3600, or permanent support under section 4320.[16] Relevant here, section 4325 creates a

___

[16] Section 3600 allows the court, during the pendency of the proceeding, to order "either spouse to pay any amount that is necessary for the support of the other spouse, consistent with the requirements of subdivisions (i) and (m) of Section 4320 and Section 4325 . . . ." Section 4320 sets forth the factors the trial court "shall" consider in

22

rebuttable presumption against awarding either temporary or permanent spousal support to a party criminally convicted for an act of domestic violence against the proposed payor of support.  (§ 4325, subd. (a).)  The trial court can consider "documented evidence of a convicted spouse's history as a victim of domestic violence, as defined in Section 6211, perpetrated by the other spouse, or any other factors the court deems just and equitable, as conditions for rebutting this presumption."  (§ 4325, subd. (b).)

Section 6211 provides, in relevant part, that " '[d]omestic violence' is abuse perpetrated against . . . (a) a spouse or former spouse."  Section 6203 defines "abuse."  As the trial court correctly pointed out in its judgment, the statute does not limit the definition of abuse solely to the infliction of physical injury or assault.  (§ 6203, subd. (b); *N.T. v. H.T.* (2019) 34 Cal.App.5th 595, 597 (*N.T.*).)  "Abuse" means "[t]o intentionally or recklessly cause or attempt to cause bodily injury," to "place a person in reasonable apprehension of imminent serious bodily injury to that person or to another," or to "engage in any behavior that has been or could be enjoined pursuant to Section 6320."  (§ 6203, subds. (a)(1), (3) & (4).)  Section 6320 allows the court to enjoin a person from "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in Section 528.5 of the Penal Code, falsely personating as described in Section 529 of the Penal Code, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party . . . ."  (§ 6320, subd. (a).)

---

ordering permanent spousal support.  (See fns. 5 & 12, *ante*.)  In addition to the requirement of section 4320, subdivision (i) that the court consider documented evidence of a history of domestic violence between the parties as defined by section 6211, section 4320, subdivision (m) requires the court to consider the criminal conviction of an abusive spouse in reducing or eliminating spousal support, pursuant to sections 4324.5 or 4325.

23

The legislative history of section 4325 reflects a strong public policy against requiring a victim of domestic violence to provide support to an abusive spouse. The Legislature enacted section 4325 to target "family law cases where there has been a history of domestic violence, seeking first and foremost to ensure that a spouse who has been criminally convicted of perpetrating domestic violence against the other spouse will be barred from receiving any spousal support from the abused spouse, regardless of the earning status of the parties." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1221 (2001-2002 Reg. Sess.) as amended June 21, 2001, pp. 3-4.) The language the Legislature used to set forth its policy goals further reflects a strong opposition to requiring victims of domestic violence to pay support to their abusers: ". . . granting spousal support to a convicted abuser is unconscionable and constitutes unjust enrichment." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1221 (2001-2002 Reg. Sess.) as amended June 21, 2001, p. 4; *In re Marriage of Cauley* (2006) 138 Cal.App.4th 1100, 1106 (*Cauley*).)

### b. *Mary Kay Did Not Introduce "Documented Evidence" to Overcome the Presumption*

There is minimal legal authority explaining what evidence Mary Kay would need to present to overcome the presumption of section 4325. California appellate courts have yet to issue an opinion finding that the presumption was rebutted; the four cases addressing section 4325 each uphold the trial court's order precluding a spouse from obtaining spousal support based on a conviction for an act of domestic violence. (*Kelkar*, *supra*, 229 Cal.App.4th at p. 836; *In re Marriage of Priem* (2013) 214 Cal.App.4th 505, 508 (*Priem*); *Freitas*, *supra*, 209 Cal.App.4th at p. 1062; *Cauley*, *supra*, 138 Cal.App.4th at p. 1102.) In doing so, none specify what evidence would be sufficient to rebut section 4325.

The language of the statute provides two ways for a convicted spouse to rebut the presumption against an award of spousal support. We consider first the statute's

provision that allows a court to find the presumption rebutted when it determines under a preponderance standard that there is "documented evidence" of the convicted spouse's history as a victim of domestic violence perpetrated by the other spouse. Section 4325 does not provide a definition of "documented evidence." We thus are required to interpret the section to apply that term. In interpreting statutes, we begin with the plain and commonsense meaning of the language of the statute, considering it in the context of the statutory framework as a whole to determine its scope and purpose, with a goal of harmonizing the parts of the statutes. (*Hassell v. Bird* (2018) 5 Cal.5th 522, 540.) Where the language is clear, we follow the plain meaning of the statute, unless doing so would result in absurd consequences unintended by the Legislature. (*Ibid.*)

Under the Evidence Code, "'[e]vidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) Neither the Evidence Code nor the Family Code define "documented evidence." Merriam-Webster defines "documented" as "to evidence by documents," "to furnish with documents," or "to provide with factual or substantial support for statements made or a hypothesis proposed." (Webster's 3d New Internat. Dict., Unabridged, <http://unabridged.merriam-webster.com/unabridged/documented> [as of Feb. 19, 2020], archived at < https://perma.cc/R4N7-4SZK>.) "Document" means "something (as a writing) that serves to demonstrate or prove something," "an original or official paper relied upon as the basis, proof, or support of something," "a writing (such as a book, report, or letter) conveying information . . . ." (Webster's 3d New Internat. Dict., Unabridged, <http://unabridged.merriam-webster.com/unabridged/document> [as of Feb. 19, 2020], archived at < https://perma.cc/Z8GZ-C4QQ>.) Under the Evidence Code, " 'Writing' means handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words,

pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." (Evid. Code, § 250.) The plain meaning of "documented evidence" in this context is evidence in the form of a writing.

We thus conclude that to overcome the section 4325 presumption against awarding spousal support to a spouse convicted of domestic violence based on "documented evidence of a convicted spouse's history as a victim of domestic violence," the convicted spouse must present written evidence in the form of a "writing" within the meaning of Evidence Code section 250 proving by a preponderance his or her history as a victim of domestic violence in the relationship. This interpretation is supported by the legislative history of the statute. Early iterations of the statute did not specify that the court had to consider "documented evidence" of a convicted spouse's history as a victim of domestic violence to rebut the presumption; rather, it stated the court "may consider a convicted spouse's history as a victim of domestic violence as a condition for rebutting the presumption" and "shall consider a reduction in the award of spousal support to a supported spouse who has a history of domestic violence against the supporting spouse." (Sen. Com. On Judiciary, Analysis of Sen. Bill No. 1221 (2001-2002 Reg. Sess.) as amended Apr. 19, 2001, p. 2.)

The Senate Judiciary Committee raised concerns: "Even with the requirement of a conviction for the imposition of a rebuttable presumption for reduction of support, the bill may lead some divorcing parties to bring domestic violence charges in the hope of reducing their support obligations. With the amendments permitting the court to consider a party's 'history' as the victim of domestic violence to rebut the presumption, or a party's 'history' as an abuser, short of a conviction, to reduce an award of support, the potential for manipulation of criminal charges to affect support obligations increases. This provision [the rebuttable presumption against support] not only may increase the large number of modification motions now filed, but could take up the time and resources

26

of prosecutors and the courts in addressing marginal charges filed for strategic purposes." (Sen. Com. On Judiciary, Analysis of Sen. Bill No. 1221 (2001-2002 Reg. Sess.) as amended Apr. 19, 2001, p. 3.) Later iterations of the bill removed language granting courts the ability to consider the convicted spouse's history as a domestic violence victim in favor of the more specific requirement ultimately adopted by the Legislature, requiring "documented evidence" of the history. (Assem. Floor Analysis, Analysis of Sen. Bill 1221 (2001-2002 Reg. Sess.) as amended Aug. 23, 2001, p. 3.) It thus appears that the Legislature, seeking to minimize the risk that divorcing parties would allege a history of abuse to obtain a strategic advantage in spousal support litigation, crafted section 4325 to require that the convicted spouse provide evidence in the form of a writing corroborating the alleged domestic violence history. We also note that the Legislature, despite its concern that a convicted spouse would attempt to use unsubstantiated claims of domestic violence to obtain spousal support from a payor spouse already victimized by abuse, did not include language requiring that the convicted spouse prove that the payor spouse was convicted of a domestic violence offense in order to rebut the section 4325 presumption against spousal support, opting instead to use the more inclusive term, "documented evidence" of a history of domestic violence.

Such "documented evidence" is familiar to trial judges in the family court, who currently hear and see many forms of writings memorializing or corroborating prior incidents of domestic violence, often proffered by parties seeking requests for domestic violence restraining orders under the DVPA. (§ 6200 et. seq.) These writings include, but are not limited to, voicemail messages, text messages, social media posts, cellphone recordings, police reports and 911 calls, medical records, photos, employment records, and court records from criminal prosecutions reflecting convictions for domestic violence offenses. In citing these examples, we do not address requirements of evidentiary authentication or admissibility, which may preclude the trial court from considering the proffered evidence, but simply note that writings as defined in Evidence Code section

27

take many forms in twenty first century century courtrooms, and are not limited to ink and paper.

Here, Mary Kay did not produce any "documented evidence" to support her contention that Chris committed domestic violence against her, electing to present her case solely through her own testimony. Because she did not introduce written evidence documenting her history as a victim of domestic violence perpetrated by Chris, Mary Kay did not rebut the section 4325 presumption against spousal support on that basis.[17]

### 3. The Trial Court Properly Considered Other Just and Equitable Factors

Under section 4325, in addition to considering documented evidence of the convicted spouse's history of abuse perpetrated by the payor spouse, the trial court may also consider ". . . any other factors the court deems just and equitable, as conditions for rebutting" the presumption against an award of spousal support to a spouse convicted of domestic violence. (§ 4325, subd. (b).) Here, although not required under the statute to consider Mary Kay's proffered evidence in light of the statute's use of the permissive "may," the trial court exercised its discretion to hear each parties' testimony regarding the three incidents Mary Kay alleged proved that Chris had abused her, as well as other arguments Mary Kay presented; it stated it was doing so "in consideration of justice and equity," referencing its discretion under section 4325 to consider "the totality of the circumstances, and facts [Mary Kay] has raised in mitigation." Thus, we consider whether the trial court abused its discretion in finding that the just and equitable factors Mary Kay raised in mitigation did not serve to rebut the section 4325 presumption.

_____

[17] While Chris's counsel did use an office visit note from Mary Kay's visit with her orthopedist to refresh her recollection regarding the injuries she alleged as a result of the March 2013 incident, the parties did not introduce that note into evidence. Mary Kay in fact contends the trial court erroneously relied on the office visit note in issuing the judgment in this case. While the trial court did suggest it relied directly on the document, which was not in evidence, rather than Mary Kay's testimony about the document, doing so would be harmless error, as Mary Kay's testimony encompassed all of the information the court relied on from the document.

28

Mary Kay asked the trial court to consider the nature of her alleged acts of domestic violence against Chris. She asserted the facts underlying her criminal conviction were distinguishable from those in opinions addressing section 4325, arguing she engaged in conduct that was less serious than that perpetrated by the abusive spouses in those cases. On appeal, Mary Kay contends the trial court erred by not finding the factual distinctions sufficient to overcome the presumption against spousal support.

Mary Kay argues the facts here are unlike those of *Cauley*, referring to the conduct that resulted in her conviction as "non-violent," without any infliction of "bodily harm" on Chris. In *Cauley*, despite allegations by husband that wife had "threatened his life in numerous telephone messages and calls and had physically attacked him several times," the parties stipulated that husband would pay wife non-modifiable spousal support. (*Cauley*, *supra*, 138 Cal.App.4th at p. 1103.) Several months later, wife "flew to Florida where [husband] was living with his girlfriend and her son. During the next couple of days, [wife] removed items from the exterior of [husband's] house, sprayed herbicide in the garden, ripped out plants, killed his fish, stole personal property, and threw numerous items in the bay behind the house. At some point during [wife's] crime spree, [husband] opened his door, and she sprayed herbicide in his face. When his girlfriend arrived, [wife] sprayed her as well." (*Ibid.*) The police arrested wife for domestic battery; wife threatened to, and ultimately did, accuse husband of rape if he refused to drop the charges against her. (*Ibid.*) Wife also violated a restraining order issued against her: "She sent written and electronic correspondence to [husband]. She made telephone calls, and left messages on his voice mail. [Wife] threatened [husband], his wife, members of their families, and his employer." (*Id.* at p. 1104.) Wife pleaded guilty to felony aggravated stalking, yet once released from custody continued making threatening telephone calls, resulting in additional criminal charges. (*Ibid.*) Applying the presumption of section 4325, the trial court granted husband's motion to terminate spousal support to wife, finding wife had not rebutted the presumption. (*Id.* at p. 1102.)

29

This court affirmed the trial court's order, "conclud[ing] that the public policy against enforcement of the nonmodifiable spousal support provision clearly outweighs any interest in its enforcement," the public policy being the "significant public policy against domestic violence." (*Cauley*, *supra*, 138 Cal.App.4th at p. 1106.) But while the facts in *Cauley* were particularly egregious, nothing in the opinion suggests application of section 4325 is limited to circumstances involving violent conduct or bodily harm. Much of wife's conduct in *Cauley* fell within the definition of stalking as defined by Penal Code section 646.9, subdivision (a) (see fn. 8, *ante*), the statute under which Mary Kay was convicted, as well as "domestic violence" as defined by Family Code sections 6211 and 6320, the statutes that implicate the rebuttable presumption of section 4325. As we have already indicated, the definition of abuse is not limited to the infliction of physical injury or assault; the term encompasses bodily injury and the fear of serious bodily injury, as well as "any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203; *N.T.*, *supra*, 34 Cal.App.5th at p. 597.) Section 6320 allows the court to enjoin a person from "molesting, *attacking*, striking, *stalking*, threatening, . . . battering, . . . *harassing*, . . . *destroying personal property*, . . . or *disturbing the peace* of the other party . . . ." (§ 6320, subd. (a), italics added.) That Mary Kay's conduct was not as extreme as the conduct of the wife in *Cauley* does not exclude it from the presumption under section 4325.

Mary Kay is correct that, in addition to *Cauley*, the three other appellate cases addressing the section 4325 presumption also involve acts of physical violence. (*Kelkar*, *supra*, 229 Cal.App.4th at pp. 836-837 [wife physically and verbally abused husband on approximately 200 occasions during the marriage, and continued to threaten and harass him after the parties dissolved the marriage]; *Priem*, *supra*, 214 Cal.App.4th at p. 509 [wife's abuse against husband resulted in numerous police reports and arrests, three criminal convictions, including one for battery, and several protective orders]; *Freitas*, *supra*, 209 Cal.App.4th at pp. 1065-1066 [husband had an undetailed history of

30

perpetrating domestic violence against wife, including a conviction for battery and claims of physical abuse after the conviction].)  Yet, these opinions do not include language restricting the application of the section 4325 presumption to incidents of physical domestic violence.  Nor does the legislative history of section 4325 include such limitation.  The legislative analysis addressed both physical and non-physical domestic violence:  "The effects and incidents of domestic violence cannot be overstated.  One study found that 7% of American women (3.9 million) who are married or living with someone as a couple were physically abused, and 37% (20.7 million) were verbally or emotional [*sic*] abused by their spouse or partner.  [Citation.]"[18]  (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1221 (2001-2002 Reg. Sess.) as amended June 21, 2001, p. 4.)  Based on our review of the cases and legislative history, we conclude the trial court did not err when it failed to distinguish between Mary Kay's acts of abuse and those in other appellate cases.

Mary Kay next argues that substantial evidence does not support the trial court's finding that Chris was not the aggressor and did not commit domestic violence in the three incidents she described in her testimony.  As a result, she asserts that the trial court erred when it failed to find that Mary Kay rebutted the presumption against support in section 4325.  We disagree, as it was well within the trial court's discretion to determine the facts and judge the credibility of the witnesses.  (*Oliverez*, *supra*, 33 Cal.App.5th at p. 319.)

In September 2009, Mary Kay grabbed Chris by the shirt during an argument and refused to let go, requiring him to "purposefully remove her hand from his shirt."  The evidence supports the trial court's finding that Chris was not the aggressor in this event, and that his conduct did not constitute "abuse" under section 6203, as he did not

---

[18] While the legislative history specifically discussed the effect of domestic violence on women, the appellate cases, discussed *ante*, reveal the problem of domestic violence affects men as well.

"intentionally or recklessly cause . . . bodily injury."[19] (§ 6203, subd. (a)(1).) Mary Kay argues the evidence shows Chris's conduct was at minimum reckless, if not intentional. The DVPA does not define "reckless" as used in section 6203. In the context of a claim for elder abuse, the California Supreme Court stated, " 'Recklessness' refers to a subjective state of culpability greater than simple negligence, which has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur. [Citations.] Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.' [Citation.]" (*Delaney v. Baker* (1999) 20 Cal.4th 23, 31-32; accord *Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 83.) Given the circumstances of the September 2009 incident, wherein Mary Kay initiated the physical confrontation and, by her own admission, refused to release Chris's shirt, the evidence supports a finding that Chris did not act in deliberate disregard of the probability of injury to Mary Kay by removing her grip from his shirt.

In May 2012, Mary Kay arrived at Chris's office unannounced during business hours and refused to leave after beginning a verbal altercation; Chris attempted to end the aggression; the trial court found Chris more credible in his testimony regarding the event. Again, we do not judge credibility on appeal; the trial court had authority to believe Chris's statement of events over Mary Kay's. (*Oliverez*, *supra*, 33 Cal.App.5th at p. 319.) Mary Kay cites *Lydon v. Beach* (1928) 89 Cal.App. 69 in support of her

---

[19] On appeal, Mary Kay argues the trial court erred in stating it was unclear whether the soft tissue swelling reflected in the x-ray Mary Kay had following the September 2009 incident was the result of the incident versus being connected to her "long-standing carpal tunnel condition or her rheumatoid arthritis . . .," arguing this finding was not based on substantial evidence. As the judge of credibility, the trial court had authority to disregard Mary Kay's testimony, even if it was uncontradicted. (*Oliverez*, *supra*, 33 Cal.App.5th at p. 319.)

contention that Chris's use "of physical force was not justifiable under the law . . . ." In *Lydon*, the lease between a landlord and tenant allowed the landlord to "enter the premises and remove all persons therefrom" if the tenant was in default on payment of the rent. (*Id*. at p. 74.) The appellate court upheld a finding that the parties who attempted to remove a tenant under such circumstances used "force greater than was necessary" to do so; they "violently and maliciously assaulted [the tenant]; . . . they beat, kicked, choked, and struck him numerous blows; . . . they bit his right ear and bruised him upon his body, neck, hip, and person . . . ." (*Id*. at pp. 71, 75.) Here, Chris held Mary Kay by her arms and escorted her out of his office. Chris's testimony, as accepted by the trial court, is sufficient to support the implied finding that his use of physical force was commensurate with the altercation.

The trial court also found Chris credibly testified regarding the March 2013 event, in which Mary Kay came to Chris's office on a Saturday, unlocked the office using a key she obtained without Chris's knowledge, and proceeded to destroy Chris's property; the testimony at trial supports these findings.[20] In Appellant's Reply Brief, Mary Kay argues the trial court's findings regarding the results of the MRI she obtained are particularly important to this court's analysis, as the trial court determined Mary Kay's orthopedist saw no blood on the MRI, but only swelling in her hip. She contends in making this finding the court relied on inadmissible evidence in the form of a the orthopedist's office visit note which was used solely to refresh her recollection and was not admitted in evidence. While the court specifically referred to the document in its ruling, Mary Kay testified to the contents of the document during her cross-examination, such that any error in this regard is harmless. (See fn. 17, *ante*.) Moreover, even if the trial court accepted

---

[20] In both Appellant's Opening Brief and Appellant's Reply Brief, Mary Kay relies here on the documents and transcripts for which she seeks judicial notice on appeal. As discussed in section II(A), *ante*, there is no evidence in the record that the court relied on these documents in issuing its judgment. As we are denying the request for judicial notice, we do not consider the documents in rendering this opinion.

Mary Kay's testimony that the MRI showed bleeding and a hemorrhage in her joint, that would not necessitate a finding that the injury was the result of domestic violence perpetrated by Chris. Again, the trial court found Chris's testimony regarding the event to be credible; his testimony, in conjunction with the court's credibility finding, provides substantial evidence in support of the trial court's finding that Chris did not commit domestic violence against Mary Kay during the incident, i.e., that he did not intentionally or recklessly cause the injury under the circumstances.[21]

Finally, Mary Kay argues the trial court should have inferred that Chris's "adultery and betrayal of [Mary Kay] after 21 years of marriage and two children caused [Mary Kay] extreme emotional distress which is another form of domestic violence . . . ." She notes, "the trial court did not acknowledge this at all for the purpose of rebutting Section 4325." Infidelity and its consequences do not fall within the legal definition of domestic violence under section 6203. (See section II(B)(2)(a), *ante*.) We thus construe Mary Kay's argument as an invocation of equity reflecting her perception that the emotional impact of Chris's alleged conduct caused as much damage to her as her acts of domestic violence caused to him. In her view, the trial court should have considered this impact as a factor under justice and equity and erred when it did not do so. However, based on our review of the record, Mary Kay did not present this argument in the trial court, and thus cannot raise it here. Generally, parties cannot argue theories on appeal that they did not present in the trial court; this applies both to theories of liability and theories of defense. (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th

---

[21] The trial court erred when it indicated in its statement of decision that Mary Kay did not provide an explanation for her failure to call 911 during the incident. This error does not compel reversal of the judgment. Given the trial court's finding that Chris's testimony was credible, we presume the trial court believed his statement that the parties agreed Mary Kay would not call 911, over Mary Kay's testimony that she attempted to call from three different locations before conceding to Chris's request that she not call emergency services.

34

982, 997; *In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 695.) "Such new arguments may be deemed waived, based on common notions of fairness." (*Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1519.) There is an exception to the general rule allowing a party to present a new theory on appeal, where it involves only a legal question that can be determined from uncontroverted facts in the record that could not be altered by the presentation of additional evidence. (*Priem*, *supra*, 214 Cal.App.5th at p. 511.) But allegations of adultery and any attendant "extreme emotional distress" are issues of fact that could be altered by the presentation of additional evidence. Thus we will not consider Mary Kay's new theory on appeal.[22]

The trial court's written decision demonstrates that the judge carefully considered and weighed the evidence presented by Mary Kay under the proper standard of proof, made findings of credibility, and ultimately concluded that Mary Kay did not rebut the section 4325 presumption against an award of spousal support. "On balance, the Court does not find that the three events to which the parties testified preponderate toward a finding that the statutory presumption against an award of spousal support to [Mary Kay], who has been convicted of conduct defined in the Family Code as domestic violence, has been rebutted." We conclude that the trial court acted within its discretion when it determined that the presumption of section 4325 applied to justify the denial of Mary Kay's spousal support request, and that Mary Kay did not rebut that presumption by a preponderance of the evidence. We affirm the judgment denying her additional temporary spousal support and setting permanent spousal support at zero.

---

[22] Mary Kay testified at length about her various medical conditions (see § I(B)(4), *ante*) and argued that her impaired health served as a factor the court should consider in determining whether she had rebutted the section 4325 presumption. Mary Kay did not raise the court's consideration of her health with respect to that presumption on appeal. The trial court weighed Mary Kay's medical conditions in its deliberation of section 4320 spousal support factors, particularly with respect to her ability to earn income. Mary Kay does not challenge the trial court's section 4320 decision on appeal.

### C. The Trial Court Did Not Err in Finding Chris's Payments from March 2015 to September 2016 to be in Lieu of Temporary Spousal Support

Mary Kay contends the trial court erred when it found that the $10,000 per month deposits Chris made from March 2015 to September 2016 into a joint account were in lieu of temporary spousal support, such that they were taxable to her and deductible by Chris under the tax laws in place at the time. The trial court had jurisdiction to make retroactive temporary spousal support orders at trial. However, we conclude Mary Kay is estopped from arguing the parties did not have an agreement to treat those payments as a substitute for formal support orders because she did not do so in the trial court. Additionally, by failing to request a statement of decision following the trial court's announcement of its tentative decision, Mary Kay waived any argument regarding the taxability of the payments. As a result, we will affirm the trial court's order.

### 1. The Trial Court Had Jurisdiction to Hear Temporary Support at the Trial

Mary Kay argues Chris "was not asking for spousal support in his [request]; he was trying to present an argument that spousal support for [Mary Kay] should be set at zero." She is incorrect. Chris checked the boxes on the Judicial Council form *Request for Order* (FL-300) asking the court to order "guideline" spousal support. He reiterated the request in his supporting declaration: "I am asking the court to set a guideline support amount based upon our respective incomes." While he opined that it was not his obligation to support Mary Kay to the extent her then-pending criminal charges affected her ability to work, Chris did not ask the court to set spousal support at zero at that time.

Mary Kay next questions whether the court had jurisdiction to rule on temporary spousal support at trial. The record on appeal is not clear regarding how Chris's spousal support request came to be scheduled for hearing during the court trial. Chris's temporary spousal support request was initially set for hearing April 30, 2015. The trial court's register of actions indicates the court issued a minute order on April 20, 2015, continuing "RFO, SC and TRIAL." Thereafter, the parties filed a stipulation and order

36

on April 29, 2015, similarly continuing "RFO, SC and TRIAL." Neither party designated either the minute order or the written stipulation as part of the record on appeal. Mary Kay, as the appellant, bears the burden to provide sufficient record to show error; otherwise, we presume the trial court's rulings were correct. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 (*Jameson*).) Thus, we presume the trial court, in either the minute order or the written stipulation and order, reserved jurisdiction to hear temporary spousal support at the trial on other issues.

In addition, Mary Kay knew prior to and during the trial that Chris expected the court to hear his request for temporary spousal support at the trial. In his pre-trial brief, Chris indicated the court continued his temporary spousal support request to be heard at trial, a statement he and his attorney reiterated during Chris's trial testimony. The trial court similarly indicated during the trial that temporary spousal support was at issue. Mary Kay did not raise any objections to the court hearing temporary support during the trial. In fact, as already noted, Mary Kay argued in her written closing statement that the trial court should consider Chris's payments as being "in lieu of" temporary support.

A party implicitly waives or forfeits claims of error if he or she fails to bring the error to the trial court's attention in an appropriate manner. (*Doers v. Golden Gate Bridge, Highway & Transp. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1; *Villanueva v. Fidelity National Title Co.* (2018) 26 Cal.App.5th 1092, 1114.) As Mary Kay did not object to the clearly stated intention, both before and during the trial, that the trial court could and would rule on Chris's request for temporary spousal support at the trial, and because Mary Kay did not include in the record the minute order and stipulation most likely relevant to the determination of whether any agreement existed to continue Chris's request for trial, we presume the trial court had jurisdiction to hear Chris's request for temporary spousal support.

## 2. *The Court Had Jurisdiction to Order Support Retroactively*

Mary Kay contends the court lost jurisdiction to order retroactive temporary support. In making initial temporary spousal support orders, the trial court has discretion to issue its orders retroactive to the date of the petition for dissolution. (*In re Marriage of Mendoza & Cuellar* (2017) 14 Cal.App.5th 939, 943 (*Mendoza*); *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 165-166.) At minimum, the court can make its orders retroactive to the date of a motion for such orders. (*In re Marriage of MacManus* (2010) 182 Cal.App.4th 330, 337.)

Mary Kay cites *In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, in support of her contention that the court lacked jurisdiction to retroactively order temporary support. In *Gruen*, following an order to show cause filed by husband, the trial court issued a pendente lite child and spousal support order, but continued the matter for further evaluation of husband's income. (*Id.* at p. 633.) Husband thereafter took his request for child and spousal support orders off calendar. (*Ibid.*) The appellate court found the trial court erred in later retroactively modifying support, as the initial order was final and immediately appealable; there was no motion pending, as husband took his request off calendar. (*Id.* at pp. 639, 640-641.)

But here, in the absence of the relevant minute order and stipulation, we presume the trial court expressly reserved jurisdiction to make retroactive temporary spousal support orders at the trial, such that the parties expected such an order to issue as part of the judgment. (See *Jameson*, *supra*, 5 Cal.5th at pp. 608-609; *Freitas*, *supra*, 209 Cal.App.4th at p. 1074.) Moreover, at no time prior to trial did the trial court make a final, appealable pendente lite spousal support order, disposing of the parties' rights on the issue. (See *Freitas,* at pp. 1074-1075.) Finally, there is no evidence Chris took his request for temporary spousal support off calendar at any time. (See *id.* at p. 1075.) While Mary Kay contends Chris conceded in his Respondent's Brief that his request was vacated, she has taken his statement out of context. Chris alleges the trial court vacated

the trial and Chris's request for temporary spousal support at a settlement conference in July 2015, and then calendared both matters for a later date in December 2015.  We do not read this as an admission that Chris took his spousal support request off calendar; the trial court simply continued the hearing with the trial to a later date.  As we presume the correctness of the trial court's orders in the absence of a record showing error (see *Jameson*, *supra*, 5 Cal.5th at pp. 608-609), we presume the trial court reserved jurisdiction to make retroactive orders at the time it continued Chris's temporary spousal support request to be heard with the trial on other issues.

### 3. *Mary Kay Is Estopped From Arguing the Payments Were Not In Lieu of Temporary Spousal Support*

"California law provides for two distinct types of spousal support—temporary and permanent.  'Awards of temporary spousal support do not serve the same purpose, nor are they governed by the same procedures, as awards for permanent spousal support.  "Pendente lite allowances and permanent allowances differ fundamentally in nature [citation] and function [citation]." '  [Citation.]  Whereas the latter is intended to make an equitable apportionment between the parties, the former is meant to allow a spouse to continue to live in the manner to which he or she is accustomed during the time the dissolution action is pending.  [Citation.]  It is also used to provide a spouse ' " 'with whatever is needed by [him or] her to litigate properly [his or] her side of the controversy.' " '  [Citation.]"  (*Mendoza*, *supra*, 14 Cal.App.5th at pp. 942-943.)

Under section 3600, the trial court can award temporary spousal support during the pendency of the dissolution proceeding in "any amount that is necessary for the support of the other spouse, consistent with the requirements of subdivisions (i) and (m) of Section 4320 and Section 4325."  Such support is intended to maintain the status quo prior to the dissolution.  (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442 (*Blazer*).)  "The trial court has broad discretion to determine the amount of temporary spousal support, considering both the supported spouse's need for support and the

39

supporting spouse's ability to pay. [Citation.]" (*Ibid.*) As the trial court correctly noted in its judgment, a payor can satisfy his or her spousal support obligation in myriad ways, such as through payments made directly to a creditor. (§ 2023, subd. (a); see *In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1367.) "For example, 'support' and 'maintenance' can encompass such items as mortgage payments on the family residence, whether paid to the supported spouse or directly to the mortgagee. [Citations.]" (*In re Marriage of Benjamins* (1994) 26 Cal.App.4th 423, 430.)

We review spousal support orders under the abuse of discretion standard, examining the order for factual and legal support. (*Blazer*, *supra*, 176 Cal.App.4th at p. 1443.) We will affirm the trial court's decision if the court exercised its discretion along legal lines, where there is substantial evidence to support the decision. (*Ibid.*) Where the trial court exercised its discretion based on the facts of the case, we will uphold the ruling if the determination falls within the range of the evidence presented. (*Ibid.*) However, we conduct de novo review where a question of law is presented on undisputed facts. (*Ibid.*)

Mary Kay contends the trial court did not have not sufficient evidence to support its finding that the parties agreed the money Chris deposited into the joint account was a form of temporary spousal support; rather, the court based its ruling on the arguments of counsel without evidentiary support. Before we consider whether the court erred in treating the $10,000 payments as being in lieu of temporary spousal support, we consider whether Mary Kay should be estopped from presenting this argument. Although Mary Kay now contends the court erred in considering Chris's monetary deposits into the joint account as payments in lieu of support, she argued the opposite to the trial court in her written closing statement. Specifically, Mary Kay claimed it was "always [her] understanding that the funds [Chris deposited into the joint account] were 'in lieu of' a formal child and spousal support order." She asked the court to "honor[] and enforce[]" the parties' agreement; the trial court did so.

Generally, the doctrine of judicial estoppel precludes a party from obtaining an advantage by taking one position, then seeking another advantage through a second, incompatible position. (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986 (*Aguilar*).) "The doctrine applies when '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' [Citations.]" (*Id*. at pp. 986-987.) Application of this doctrine is discretionary. (*Id*. at p. 986.)

In determining whether Mary Kay was successful in asserting her position in the trial court, we observe a distinction between Mary Kay's request and the court's final order. At trial, Mary Kay asked the court to treat Chris's payments as a substitute for formal child and spousal support orders. However, the court only considered the payments to be in lieu of spousal support, and determined that the payments were taxable to Mary Kay. At the time of trial, former Internal Revenue Code of 1986 section 71 governed the taxability of child and spousal support (Act Oct. 22, 1986, P. L. 99-514, Title XVIII, § 1843(a)–(c)(1), (d), 100 Stat. 2853, 2855); that statute was repealed in 2017 by Act Dec. 22, 2017, P. L. 115-97, Title I, Subtitle A, Part V, § 11051(b)(1)(B), 131 Stat. 2089. Under both statutory schemes, child support payments are not taxable to the recipient. (See *Mathews v. Commissioner of Internal Revenue* (T.C. 2015) 110 T.C.M. (CCH) 483, citing former I.R.C. § 71(c).) At the time the trial court issued its ruling, spousal support payments were considered taxable to the recipient, and deductible by the payor. (Former I.R.C. §§ 71(a), 215(a).)

Although Mary Kay requested orders for both child and temporary spousal support, and the trial court issued an order for temporary spousal support only, the trial court's characterization of the payments was consistent with Mary Kay's request. The trial court determined the payments Chris made from March 2015, when he filed the

41

request for spousal support, to September 2016 were in lieu of spousal support. The court did not include child support orders because the parties' youngest child had turned 18 and graduated from high school by June 2014. Chris was no longer obligated to pay child support at the time he requested spousal support orders in 2015. (§ 3901, subd. (a).) Even if Chris could have been subject to child support orders after March 2015, at the time of trial, unallocated, combined child and spousal support payments were treated as spousal support for tax purposes under former Internal Revenue Code section 71, unless the orders fixed an amount payable for the support of the child, or included a provision reducing the amount of support on the happening of a contingency relating to the child. (*DeLong v. C.I.R.* (T.C. 2013) 105 T.C.M. (CCH) 1446, at *4.) Mary Kay did not ask the trial court to allocate a specific amount of the $10,000 payments Chris made as child support. Nor did she ask the court to designate the payments as being nontaxable to her.

Under the doctrine of judicial estoppel, we conclude Mary Kay did take two positions: at trial, she asked the court to find the $10,000 payments to be in lieu of formal temporary support orders, honoring the parties' agreement; on appeal she argues the trial court erred in making such an order. She was successful in asserting her request in the trial court; the position she takes on appeal is wholly inconsistent with her original and successful request. There is no evidence she took the position in the trial court as a result of ignorance, fraud, or mistake. Thus, Mary Kay is estopped from now arguing it was error for the trial court to treat the $10,000 payments made from March 2015 through September 2016 as payments in lieu of temporary spousal support. (*Aguilar*, *supra*, 32 Cal.4th at p. 986.)

### 4. *Mary Kay Waived Arguments Regarding the Taxability of the Payments*

Mary Kay contends the court erred when it found the temporary spousal support payments to be taxable to her and deductible by Chris, claiming spousal support is not taxable to the recipient unless there was a spousal support order or agreement in place before the payments were made, citing former Internal Revenue Code section 71. She

42

further argues the court could not "retroactively change the nature of the payments already made," but does not cite any legal authority in support of that proposition.

The record on appeal does not reflect that Mary Kay made any arguments regarding the taxability of the payments to the trial court, despite Chris's clear request that the court find the payments to be taxable to Mary Kay and deductible to him as a form of temporary spousal support. The court included its finding that the payments were taxable to Mary Kay in its tentative decision, which the trial court had served on the parties' attorneys by mail on the date of its issuance. The court did not specify the legal basis for its finding in either the tentative decision or the judgment. Nothing in the record indicates either party requested a statement of decision from the court after it issued the tentative decision, pursuant to Code of Civil Procedure section 632 and California Rules of Court, rule 3.1590(d).

"The proper procedure, after the trial court issues its [tentative decision], is to request a Code of Civil Procedure section 632 statement of decision. [¶] A statement of decision allows the trial court to review its memorandum of intended decision and 'to make . . . corrections, additions, or deletions it deems necessary or appropriate.' [Citation.] Such statement thus enables a reviewing court 'to determine what [law] the trial court employed . . . .' [Citation.] It is the statement of decision which allows the court to place upon the record its view of facts and law of the case. [Citation.] A failure to request a Code of Civil Procedure section 632 statement results in a waiver of such findings; [the appellant] cannot now be heard to complain. [Citation.]" (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 647 (*Ditto*); accord *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 269 (*Shaw*).) Here, as in *Ditto*, the trial court did not cite any law or give any additional explanation in its judgment for its finding that the payments Chris made to Mary Kay were taxable to Mary Kay and deductible to Chris.

As neither party requested a statement of decision, "[w]e must therefore presume the judgment is correct. [Citation.]"[23] (*Id*. at p. 647.)[24]

### D. Duck Club Membership

Mary Kay contends the trial court erred when it awarded the Duck Club membership to Chris at a value of $60,000, as the parties stipulated that the value was $65,000. Chris, in his pretrial brief, indicated the parties would stipulate that the membership had a value of $60,000. On the record during the trial, the parties stated that the membership had a value of $65,000. The trial court's minute order from the first day of trial confirms the court awarded Chris the membership with a value of $65,000. Yet, in the tentative decision and resulting judgment, the court awarded the membership to Chris at the $60,000 value.

Where a written order fails to conform to the trial court's oral order, the appellate court can consider the circumstances of the case to determine which should prevail. (See *People v. Smith* (1983) 33 Cal.3d 596, 599; *In re Maribel T.* (2002) 96 Cal.App.4th 82, 86 (*Maribel T.*).) It was Chris's counsel who, on the record, indicated the parties' agreed to value the membership at $65,000. The minute order from the trial confirmed the court awarded the membership to Chris at a value of $65,000. There was no other discussion of the membership during the trial, suggesting the written judgment issued by the trial court placing the value at $60,000 did not embody the terms contemplated by either the

---

[23] The trial court did, in the judgment, include findings of facts and conclusions of law in support of its orders deeming Chris's payments were made in lieu of spousal support and determining that Mary Kay did not rebut the section 4325 presumption, such that we are able to properly review those decisions on appeal. (See *Shaw*, *supra*, 170 Cal.App.4th at p. 269.)

[24] Our determination that Mary Kay waived her claims on appeal is without prejudice to any arguments Mary Kay might make in proceedings involving the Internal Revenue Service, State Franchise Tax Board, or any other relevant taxation agency, regarding the application of relevant tax laws to Chris's payments of temporary spousal support under the trial court's order.

44

court or the parties. (*Maribel T.*, at p. 86.) We will therefore order the judgment modified to reflect the value of the Duck Club membership at $65,000, and affirm the judgment as modified.

### III.   DISPOSITION

The June 12, 2017 judgment is modified to award the Gables Land and Cattle Company/ Duck Club membership to Chris at a value of $65,000. The modified judgment is affirmed. Appellant Mary Kay Brewster shall pay Respondent Chris Clevenger's costs on appeal.

_____
Greenwood, P.J.


WE CONCUR:




_____
 Bamattre-Manoukian, J.










_____
 Danner, J.










Brewster v. Clevenger
No. H045050

Trial Court:                          Monterey County Superior Court
                                      Superior Court No.: DR54512

Trial Judge:                          The Honorable Heidi K. Whilden


Attorney for Appellant,               Debra Gemgnani Tipton
Mary Kay Brewster:                    Law Offices of Debra Gemgnani Tipton




Attorneys for Respondent,             Joel Franklin
Chris Clevenger:                      Law Offices of Joel Franklin

                                      C. Micheal McClure
                                      Law Office of C. Micheal McClure